IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:14-CV-896-FL

| | | |
|---|---|---|
| MADAY LIMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| MH & WH, LLC; HALLE BUILDING | ) | |
| GROUP; WENDY A. HOWINGTON; and | ) | |
| MICHAEL J. HOWINGTON | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on motions for partial summary judgment by plaintiff and

defendants MH & WH, LLC ("MH & WH") and Halle Building Group ("HBG"). (DE 129, 133,

140). Also before the court are the motions for summary judgment by defendants Michael J.

Howington ("Michael Howington") and Wendy A. Howington ("Wendy Howington") (DE 137,

142).[1] These motions have been briefed fully. In this posture, the issues raised are ripe for ruling.

For the following reasons, the motions are granted in part and denied in part.

## BACKGROUND

This action arises out of alleged wage and hour violations and improper conduct by a

supervisor while plaintiff was working at HBG construction projects in and around Apex, North

Carolina. On December 22, 2014, plaintiff filed pro se an application to proceed in forma pauperis

and a proposed complaint with exhibits, asserting claims against HBG and MH & WH, as alleged

---

[1] Although defendant Wendy Howington's motion for summary judgment is captioned as a motion for partial summary judgment, as discussed herein, it seeks dismissal of all claims asserted against her, and it is thus construed as a motion for summary judgment.

joint employers, together with alleged employees thereof, defendant Wendy Howington and former

defendant Terry Stanley ("Stanley"). Plaintiff also asserted claims against former defendant A.

Humphries ("Humphries"), a police sergeant.[2]

The court upon frivolity review construed the complaint to assert viable claims under Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; the North Carolina Wage and Hour Act

("NCWHA"), N.C. Gen. Stat. § 95-25.1 et seq.; assault; and battery. On recommendation of a

magistrate judge, in order entered August 12, 2015, the court allowed plaintiff to proceed on Title

VII claims against MH & WH and HBG; FLSA and NCWHA claims against MH & WH, HBG, and

Wendy Howington; and assault and battery claims against Stanley, MH & WH, and HBG.

Defendant Humphries was dismissed from the action.

After a period of time for service, defendants HBG, MH & WH, and Wendy A. Howington,

answered the complaint on March 9, 2016. Former defendant Stanley filed a motion to dismiss for

insufficient service. Upon magistrate judge recommendation, on February 9, 2017, the court

dismissed without prejudice claims against Stanley for lack of personal jurisdiction and insufficient

service of process.

Case management order entered March 16, 2017, initially provided for discovery to be

completed by June 30, 2017. On May 23, 2017, the court amended the case management order to

clarify that the case is not automatically selected for mediation, and the court struck notice filed by

defendants of mediator choice.

---

[2] As discussed herein, Stanley and Humphries have been dismissed from this action.

On May 31, 2017, counsel entered an appearance for plaintiff, and plaintiff's filings have since that time been made through counsel. Upon plaintiff's motion to amend case management order, on July 14, 2017, the court extended the discovery deadline to November 30, 2017, and allowed plaintiff until September 1, 2017, to file a motion to amend pleadings. Plaintiff timely moved to amend her pleadings, and the court granted in part and denied in part the motion to amend on November 3, 2017. Plaintiff's first amended complaint, filed November 9, 2017, contains the following claims against defendants HBG, MH & WH, Wendy Howington, and newly-added defendant Michael Howington:

1) FLSA claim for failure to pay proper overtime wages, in violation of 29 U.S.C. § 207, against all defendants (Count One).

2) NCWHA claim for failure to pay all owned, earned, and promised wages, in violation of N.C. Gen. Stat. § 95-25.6, against all defendants (Count Two).

3) Title VII claim for sex discrimination, hostile work environment, constructive discharge, and retaliation, against defendants MH & WH and HBG (Count Three).

4) Assault, battery, and intentional infliction of emotional distress ("IIED") claims based upon vicarious liability against defendants MH & WH and HBG for actions of former defendant Stanley (Counts Four, Five, and Six).

5) Negligent supervision against defendants MH & WH and HBG (Count Seven).

As relief for FLSA and NCWHA violations, plaintiff seeks unpaid wages, liquidated damages, attorney's fees, and interest. For additional violations, plaintiff seeks back pay, front pay, past pecuniary losses, compensatory damages, consequential damages, punitive damages, attorney's fees and interest. Plaintiff demands a jury trial.

3

The instant motions for summary judgment and partial summary judgment all were filed on March 23, 2018. In its motion for partial summary judgment, defendant HBG seeks dismissal of plaintiff's NCWHA, assault, battery, and IIED claims; as well as claims for damages comprising actual medical damages, lost wages, and pain and suffering.[3] Defendant HBG relies upon a statement of material facts and memorandum of law, as well as the following materials: 1) depositions of defendants HBG, MH & WH, and Michael Howington; former defendant Stanley; and plaintiff; 2) declaration of Eric Rifkin ("Rifkin"), acting assistant vice president of HBG; 3) a "Vendor Ledger" produced by HBG; 4) plaintiff's paystubs; 5) an "Employee Contact List" for defendant MH & WH; 6) Equal Employment Opportunity Commission ("EEOC") documents pertaining to plaintiff; and 7) plaintiff's first supplemental initial disclosures.

In its motion for partial summary judgment, defendant MH & WH adopts and incorporates by reference the arguments raised by defendant HBG in support of dismissal of plaintiff's NCWHA, assault, battery, and IIED claims; as well as claims for damages comprising actual medical damages, lost wages, and pain and suffering. Defendant MH & WH also moves for summary judgment on plaintiff's FLSA claim on the ground that it did not have sufficient volume of business to meet a statutory threshhold of liability. Defendant MH & WH relies upon its answer to plaintiff's second set of interrogatories. Defendant MH & WH also adopts and incorporates by reference the statement of facts of defendant Wendy Howington.

In her motion for summary judgment, defendant Wendy Howington seeks dismissal of the FLSA and NCWHA claims asserted against her, on the basis that she is not an employer for purposes of such claims. Defendant Wendy Howington relies upon a statement of material facts,

---

[3] Defendant HBG withdraws in reply its argument in favor of dismissal of plaintiff's Title VII claim, asserted initially in its motion.

depositions of HBG, MH &WH, Michael Howington, Wendy Howington, and plaintiff, as well as a declaration of Wendy Howington and plaintiff's paystubs.

In his motion for summary judgment, defendant Michael Howington seeks dismissal of the FLSA and NCWHA claims asserted against him, on the basis that they are time barred. Defendant Michael Howington relies upon a statement of material facts and depositions of plaintiff and MH & WH.

In her motion for partial summary judgment, plaintiff seeks a determination as a matter of law that defendants MH & WH and HBG jointly employed plaintiff for purposes of each of plaintiff's claims. Plaintiff relies upon a statement of material facts and depositions of MH & WH, HBG, Michael Howington, and Terry Stanley, as well as 1) daily timesheets sample, 2) photos of HBG attire, and 3) a HBG holiday card. In opposition to defendants' motions, plaintiff relies upon opposing statements of material facts and the same depositions relied upon in those motions.

In joint opposition to plaintiff's motion for partial summary judgment, filed April 13, 2018, defendants HBG and MH & WH rely upon an opposing statement of material facts. They also rely upon 1) the depositions relied upon in their motions, 2) declaration of Michael Howington, 3) second declaration of Rifkin, 4) plaintiff's Rule 30(b)(6) deposition notice for MH & WH, 5) plaintiff's time sheets and pay stubs, and 6) a HBG gift card.

Plaintiff replied in support of her motion for summary judgment, and defendant HBG replied in support of its motion, on April 26, 2018. No other defendants filed replies in support of their motions.

5

## STATEMENT OF FACTS

As pertinent to the instant motions, the undisputed facts and other facts viewed in the light most favorable to plaintiff may be summarized as follows.[4]

A.    Defendants' business activities

Defendant MH&WH provides construction labor. (Pl's Stmt. (DE 145) ¶ 2).[5]    Defendant HBG is a general contractor for residential homes and apartment complexes.  (Id. ¶ 4).

At times relevant to the instant case, in 2012-2013, Michael Howington and Wendy Howington were owners and members of MH & WH. (Id. ¶ 3; see W. Howington Dep. at 7, 19).[6] Defendant MH & WH supplied labor to HBG for construction projects.  (Pl's Stmt. (DE 145) ¶ 5). They maintained the same business address.  (Def. HBG Stmt. (DE 150) ¶¶ 2, 4).   Defendant Michael Howington was responsible for management of HBG's construction, and he had an ownership interest in HBG.  (Pl's Stmt. ¶¶ 8, 9). He formed HBG in 2006 with non-party Warren Halle.[7] (MH & WH Dep. (30(b)(6) by M. Howington) pp. 27-28). His management responsibilities for HBG included design, site work, and "construction management," including visiting construction sites to check on the quality of work performed by subcontractors, including MH & WH.  (Id. pp. 37-39; Pl's Stmt. (DE 145) ¶¶ 10, 11).  If there was "something that wasn't going on correctly" at

---

[4]  Additional facts viewed in the light most favorable to defendants will be addressed in conjunction with analysis of plaintiff's motion for partial summary judgment.

[5]  The court cites to statements of material facts in the record in instances where facts are designated as undisputed.  The court cites to other evidence in the record where facts are not designated as undisputed in statements of material facts.

[6]  Citations to depositions in the record specify page numbering as shown on the face of the deposition transcript, not the page number specified by the court's electronic case filing (ECF) system, particularly where a single deposition is filed multiple times in the record, sometimes in condensed form and sometimes not.

[7]  Plaintiff had proposed to add Warren Halle as a defendant in proposed amended complaint filed July 18, 2017, but the court disallowed in that part amendment as futile on November 3, 2017.

a job site, he would tell the "respective supervisors" on the job site what they needed to do to change it or fix it. (MH & WH Dep. p. 39). HBG held out to the public that defendant Michael Howington was acting in the capacity of a vice president for HBG. (Id. at 62-63).

An employee of MH & WH who worked on HBG job sites, Moises Hernandez ("Hernandez"), acted as a manager to laborers on HBG job sites. (Id. p. 69). Former defendant Terry Stanley was an employee of HBG in the position of a "superintendent" on HBG job sites, who supervised twelve MH & WH laborers on HBG job sites and "told the laborers what to do." (Pl's Stmt. (DE 145) ¶ 15; M. Howington Dep. p. 72; HBG Stmt. (DE 131) ¶¶ 17-18).

Defendant Wendy Howington's work for MH & WH included payroll duties; handling insurance and workers compensation; maintaining personnel files for employees of MH & WH; and filling out forms when former employees filed for unemployment. (W. Howington Dep. pp. 11-12, 14-15, 20). MH & WH did not have any other designated employees who performed human resources functions. (Id. at 15). Defendant Wendy Howington also hired employees to work at a gas station owned by MH & WH, and she supervised those employees. (Id. at 17). Defendant Michael Howington hired non-gas station employees of MH & WH, and he had authority to discipline and fire them. (Id. at 17-18). Defendant Michael Howington, in conjunction with defendant Wendy Howington made a determination whether to classify an employee as exempt or nonexempt for purposes of qualification for overtime pay. (Id. at 118).

B.    Plaintiff's employment

In or about the summer of 2012, while plaintiff was working for a construction contractor at an apartment complex building site in Apex, North Carolina, defendant Michael Howington asked plaintiff if she wanted to work for him. (Pl's Dep. pp. 31-33). Warren Halle also that same date

asked plaintiff if she wanted to work for his company. (Id.). She responded yes, to both. (Id.). She started working at that job site and others, under the direction and supervision of different individuals, including: 1) Mark Gramling ("Gramling"), who was a project manager for defendant HBG; 2) Wesley Stanley, who was a supervisor who worked for defendant HBG; 3) Bill Torgeson, who was a supervisor for new home construction for defendant HBG; 4) Rick Cattano, who was a supervisor for new home construction for defendant HBG; 5) Hernandez, who as noted previously was a MH & WH employee working on projects for defendant HBG; and Martin Arias, who was a supervisor who worked on projects for defendant HBG. (Id. at 40; MH & WH Dep. (30(b)(6) by M. Howington) pp. 69, 75, 77, 83, 85). All of these supervisors were able to instruct plaintiff to modify her work and had the ability to terminate plaintiff. (MH & WH Dep. (30(b)(6) by M. Howington) p. 85).

Plaintiff filled out daily timesheets captioned "HALLE BUILDING GROUP DAILY TIME SHEET," which recorded her hours and description of work. (E.g., DE 136-2). Plaintiff received a holiday bonus from Warren Halle and Martha Halle, owners of defendant HBG, in an envelope with her name typed on the front of it. (E.g. DE 136-4; see HBG Dep. (30(b)(6) by Eric Rifkin) pp. 41-43). It was common for defendant HBG to provide a holiday bonus to workers doing work for defendant HBG on its projects. (Id. at 43). Plaintiff received work clothing marked "Halle Companies." (E.g., DE 136-3). Gramling led weekly safety meetings for workers at HBG work sites, including plaintiff. (MH & WH Dep. (30(b)(6) by M. Howington) pp. 111-113). Defendant HBG provided to all workers at HBG work sites, including plaintiff, equipment, such as hard hats, gloves, working tools, materials, brooms, shovels, cleaning supplies, and eye protection, as needed for the work. (Id. at 114-116).

8

In February, 2013, Bill Torgeson and Martin Arias directed plaintiff to work at an apartment complex job site in Holly Springs, and to look for former defendant Stanley and someone named "Mark" who would be her supervisors. (Pl's Dep., p. 44). When plaintiff arrived at the Holly Springs job site, Stanley directed her to work on exteriors and set mulch, even though Bill Torgeson and Martin Arias had told her prior to transfer she was going to be "the sheetrock and paint supervisor." (Id. p. 45). On her second day at the Holly Springs job site, Stanley called plaintiff over to a portion of the job site and, along with Warren Halle and Michael Howington, accused her of "something having been done wrong that [she] had nothing to do with." (Id. p. 47). They said "I worked for them, and I was in charge as a supervisor for the paint and sheetrock[,] and if I could not do my job, to let them know and they would hire somebody else." (Id. p. 48).

Starting about that time, Stanley engaged in a number of practices offensive to plaintiff while supervising and directing plaintiff's work. According to plaintiff:

> [He] grabbed the top of his zipper and then rubbed his part in front of everybody and said in front of everybody that what I needed was that. I needed that to be able to work there. That there only men worked and that women were useless, and that we were only useful for cleaning and having children. And the people around us, I didn't see faces. I just knew they were there. I heard the laughter and the giggling. And people, some of them came up to me and said, "Well, if" -- you know, they would touch theirs, touch their -- their area and say if I needed it, they'd loan it to me, that they'd loan me theirs such that I could work there. That was the first time he did it. I've got that well recorded because it was so humiliating and made -- made me a laughing stock.

(Id. p. 78). Immediately prior to this incident, plaintiff was sealing wood framing for inspection, and Stanley had directed plaintiff to "get up on a ladder and seal it properly." (Id. p. 80). They disagreed about whether it had been sealed properly, and "he said, 'No, it's not fine,' and he touched his part. He cackled, and he went all red when he touched his part." (Id.). They were in a building working at the time this happened, engaged in sealing the frame. (Id.).

9

Plaintiff reported this incident to defendant Michael Howington, two days later, when she saw him at the MH & WH gas station job site, where she was doing maintenance work. (Id. at 81). She told him that she "sensed aggression, that [she] felt harassed, that what [Stanley] had done to [her] when he had touched his part. . . . And [she] showed him what he had – how he had done it." (Id. at 82). Michael Howington responded "Okay, I'll check. Thank you, Maday." (Id.).

According to plaintiff, Stanley made "constant" offensive comments about gender and gestures of a sexual nature. (Id. at 73). On various occasions he said "Look, this is why women shouldn't work here. Women can't work here because they can't do the job." (Id.). "He'd say this to [plaintiff] when he touched his [private] part." (Id.). He touched his private area in front of her "[o]n repeated occasions, including once where "he grabbed his part and he said to [plaintiff] 'Touch, touch, it's good for you. Do you need this?" (Id. at 83). "When others couldn't do their job, he blamed [plaintiff], [and] he said 'Women are only useful for having children and doing cleaning." (Id. at 73).

One time, when plaintiff used a portable toilet at the construction site, Stanley started banging on the door, and said "I need you right now. What are you doing in there?" and "There shouldn't be bathrooms for women here. These bathrooms are for men, just for men." (Id.). When she got out of the bathroom, he told her to get to work on in prepping for a plumbing and electrical inspection. Plaintiff said "This is the work of the plumbers," and he responded "Well, this is why you're here. This is what the women are for, to do that which we can't do. And that's how we work." (Id. p. 74).

10

According to plaintiff, Terry Stanley also threw tools and items to the ground near plaintiff when directing her to work. For example:

> He called me on the phone and said, "I need you." And I was in the bathroom. I told him "I'm in the bathroom." And he said, "You come right now." I mean, I couldn't even go to the bathroom. It was my break. I didn't eat that day. I showed up and he said, "We have to turn this over for inspection." And I said, "Look, I've got my food in my hand. Let me go leave it in the truck." And he threw the ladder to the floor. And he said, "No, you work now." I said to him, "I haven't even eaten. And he said, "That's not my problem." He said, "Get to work," and he threw my ladder to the floor. Two electricians were there. One of the carpenters there said to me, "Don't let them treat you like that."

(Id. p. 62). At another time:

> It was time to get off, to get off work. And he looked to me. He says, "Overtime." And I said, "I can't." I didn't argue with him. It was obligatory. So he said, "Well, if you can't, then tomorrow don't come back in." So we stayed. He said inspection tomorrow, so we stayed. We were on the lower level. When my coworker was carry -- was carrying the ladder as we walk -- as -- with me.· And then he grabs the ladder and throws it to the -- throws it down. And says, "Look, carry it yourself." I had my tool bucket. And as I was putting my tool bucket down he says, "Hurry up, get to work."

(Id. pp. 65-66). At another instance when they were working on repairs for an inspection, plaintiff asked him what he wanted her to do, Terry Stanley grabbed a hammer from a set of tools, threw it to the floor in front of plaintiff, looked at plaintiff and "holler[ed], 'Think.'" (Id. at 68). On another occasion in discussing a job needing to be done, he threw a hammer on the floor in front of plaintiff.

(Id. at 69). According to plaintiff,

> it wasn't just hammers. It wasn't just tools. . . . it was brooms, buckets, containers. It was always some kind of aggression. He would look at me and say, "He[y] get it." I mean, I'd look at him and he enjoyed it. I can honestly tell he enjoyed it. He laughed. He'd make other people laugh. He enjoyed that. And even when other people weren't around, he would still do it.

(Id. at 72).

11

According to plaintiff, by April 2013, plaintiff tried regularly to avoid direct contact with Terry Stanley while working. One day around that time, according to plaintiff,

> [Hernandez] was with me that day. And I -- I just remember when the other workers said, "Look, look, here comes Terry, here comes Terry." And so I hid. I hid behind a column. And [Hernandez] was with me. And I urinated. I started to cry and I started to shake. And [Hernandez] says to me, he says, "Calm down." That's when I said to him, "I don't know what's happening to me. This has never happened to me." I said, "I need a change. I just can't bear it. I just can't bear being like this anymore." That was when [Hernandez] was with me and Terry [Stanley] was coming, and that's when I urinated on myself. [Hernandez] saw and he said, on that day he says, "Look, tomorrow, we're going to move you. You'll be with the carpenters." And he -- and I said to them, I said, "Look, go ahead and demote me. That's fine. I just can't be here anymore. . . . I'd quit if I could, but I can't. I need the money. . . ."

(Id. p. 86). Hernandez arranged a transfer to a different work site for plaintiff, and for a period of about two weeks, up to the day before plaintiff's last day at work, plaintiff worked exclusively with carpenters and she did not have any complaints. (Id. at 87). Plaintiff switched then from having her time and overtime recorded by Stanley, and time sheets signed by Stanley, to having Hernandez "take care of recording everything having to do with" her work time. (Id. at 88).

On plaintiff's last day present on the job site, according to Plaintiff, Stanley engaged in offensive and injurious behavior towards her while she was carrying out work functions. Plaintiff was working with a co-worker sealing a roof on one portion of the job site about 1:45 in the afternoon, when she got a call from Hernandez, who said that "Terry Stanley wanted to talk to [plaintiff] and that he was very angry," and wanted her to come over to another area of the job site. (Id. at 90). Plaintiff started to shake and was agitated, but her co-worker, Arturo, offered to come with her and to "take care of everything." (Id. at 90-91). Plaintiff describes the encounter that ensued with Stanley as follows:

It had been two weeks since I had worked there. He says to me, "This is your fault." I said to him, "I didn't work here today. Victor was here." And he says, "No, you're the one that's responsible." He never called Victor, and he had been -- he had been the one who had been working there all day. There was no reason for him to get on me for that work. He says, "Look, this -- this is all trash work. This -- this isn't good for anything. This is all trash." He says, "Tomorrow there is an inspection. You're not going to move away from this until you're done with this." Arturo had a -- a gun with a gas cylinder in it. We both had our sealers. They were new cylinders. We had just loaded them. Arturo had the ladder and he said, "Don't worry about it. I'll get up there." He said, "I'll seal it." Terry Stanley said, "No, not Arturo. You." And I said to him, "But he's already sealing. Arturo's working." He said to me, "No."

That's when he got upset, when I said Arturo is already up there sealing. That's when he got upset. And I had the sealer here in this hand, the sealer with the cylinder. I had my bucket here with cylinders and such, the blue bucket. <u>He got upset when I told him that Arturo was sealing. And when he said, "No, you," that's when he -- he got -- when he -- when he grabbed the sealer out of my hand. He removed the cylinder from the sealer, and he threw it in my face.</u> Just by -- by use of reflexes, I was able to protect myself. I reacted quickly. I wasn't expecting that. But for fear, I mean, he had a facial expression, an expression on his face. He's white. <u>He was red and purple at the same time. His mouth was shaking. And he was spittling out of his mouth. When he threw the cylinder at me, I felt as though he was going to kill me. I raised my hand, and it hit me here in this area (gestures).</u>

(<u>Id.</u> at 91-93) (emphasis added). Plaintiff drove herself home, left her truck running, got inside, had a "terrible headache," and felt chills, and pain. (<u>Id.</u> at 94-95). She tried to get up and she "couldn't feel" her body, lost movement in half of her body, and she fell down, hitting herself. (<u>Id.</u> at 95).

Defendant Michael Howington called plaintiff the next day to ask what happened, suggesting that he heard that she cried, and he directed Hernandez also to call plaintiff. Plaintiff talked to Hernandez several times. Hernandez came to see plaintiff several days later and said "Mike says he can't help you anymore and that you can't count on him." (<u>Id.</u> at 110). Plaintiff was incapable of returning to work. (<u>Id.</u> at 95).

Additional facts pertaining to issues raised by the instant motions will be discussed in the analysis herein.

## DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

14

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.      Analysis

1.      Claims Not Covered by Defendants' Motions

As an initial matter, the court notes that the following claims or portions of claims are not covered by defendants' summary judgment motions, and that such claims will be proceeding to jury trial independent of the court's decision in the instant order:

1)      FLSA claim for failure to pay proper overtime wages, in violation of 29 U.S.C. § 207, against defendant HBG (Count One).

2)      Title VII claim for sex discrimination, hostile work environment, constructive discharge, and retaliation, against defendants MH & WH and HBG (Count Three).

3)      Negligent supervision against defendants MH & WH and HBG (Count Seven).

The court turns next to evaluating the issues raised by the summary judgment motions.

2.      Defendant Michael Howington

15

Defendant Michael Howington seeks dismissal of the FLSA and NCWHA claims asserted against him on the basis that they are time barred and do not relate back to the time of original pleading. Defendant Michael Howington was added as part of amended complaint November 9, 2017. Accordingly, claims against him are timely only if the relate back to the date of the original pleading.[8]

An amendment to a pleading relates back to the date of the original pleading when, in pertinent part:

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > (i)    received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > (ii)   knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c). "[A]n amendment that changes the party against whom a claim is asserted relates back to the date of the original pleading if (1) the claim in the amended complaint arose out of the same transaction that formed the basis of the claim in the original complaint; (2) the party to be brought in by the amendment received notice of the action such that it will not be prejudiced in maintaining a defense to the claim; and (3) it should have known that it would have originally been

---

[8] For statute of limitations purposes, the date of commencement of the action is the date plaintiff filed her in forma pauperis application and lodged her complaint therewith. <u>See</u> <u>Robinson v. Clipse</u>, 602 F.3d 605, 608 (4th Cir. 2010).

named a defendant "but for a mistake concerning the identity of the proper party." Goodman v. Praxair, Inc., 494 F.3d 458, 467 (4th Cir. 2007) (en banc).

"At bottom, the inquiry when determining whether an amendment relates back looks at whether the plaintiff made a mistake in failing to name a party, in naming the wrong party, or in misnaming the party in order to prosecute his claim as originally alleged, and it looks into whether the rights of the new party, grounded in the statute of limitations, will be harmed if that party is brought into the litigation." Id. at471. "Notice may be presumed when the nature of the claim is apparent in the initial pleading and the added defendant has a sufficient identity of interest with the original defendant." Id. at 474 (quotations omitted).

Here, the first requirement of common transaction and occurrences is met, where plaintiff's amended complaint adds defendant Michael Howington to wage and hour claims already asserted in the original complaint. (Compare Compl. Stmt. (DE 6) at 2 with Am. Compl. ¶¶ 68, 74-75). The second requirement also is met because defendant Michael Howington had notice of the action such that he will not be prejudiced in maintaining a defense to the claim. Defendant Michael Howington was identified in the original complaint by name, (see, e.g., Compl. (DE 5) at2), even though he was not named as a defendant for purposes of FLSA and NCWHA claims. In addition, he has an identity of interest with originally-named defendants MH &WH and HBG, given his alleged ownership and management interests therein. (Pl's Stmt. (DE 145) ¶¶ 3, 8, 9).

The third requirement, that he knew or should have known that the action would have been brought against him but for a mistake in proper party's identity, also is met. Where the FLSA provides a definition of a defendant "employer" for purposes of wage and hour claims that is more expansive than the term commonly is understood, as discussed further herein, it is reasonable to

17

expect that an uncounseled employee would mistakenly fail to name all individuals and entities who may be subject to a wage and hour act claim.

Defendant Michael Howington argues there is no mistake regarding his identity, because he hired plaintiff and plaintiff knew he worked for her employer. Rule 15(c), however, does not require a mistake of identity, but rather any type of "oversights or mistakes of inclusion or omission." Goodman, 494 F.3d at 471. "The Rule does not concern itself with the amending party's particular state of mind except insofar as [s]he made a mistake." Id. at 469.

Defendant Michael Howington also argues he cannot be expected to know that there could be claims against him personally. He admits, however, that he personally hired plaintiff. (M. Howington Mem. (DE 143) at 3; Stmt. of Facts ¶ 2). Plaintiff's original complaint also named his former wife, defendant Wendy Howington, personally, as a defendant for her role in handling payroll activities for MH & WH and HBG. (Compl. 2-3; Compl. Stmt. at 2). In such circumstances, defendant Michael Howington should have known that an action would have been brought against him but for a mistake on the part of plaintiff concerning the proper party's identity.

Accordingly, plaintiff's amendment adding defendant Michael Howington properly relates back to the date she commenced this action. Therefore, defendant Michael Howington's motion for summary judgment on the basis of statute of limitations is denied.

3.     Defendant Wendy Howington

In her motion for summary judgment, Wendy Howington seeks dismissal of the FLSA and NCWHA claims asserted against her, on the basis that she is not an employer for purposes of such claims.

18

The FLSA provides a cause of action by an "employee" against "[a]ny employer" who violates sections 206 or 207 of the FLSA. 28 U.S.C. § 216(b). The FLSA "provides little guidance as to what constitutes an employer-employee relationship or 'employment' sufficient to trigger its compensation provisions." Benshoff v. City of Virginia Beach, 180 F.3d 136, 140 (4th Cir. 1999). An "employee" is as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and an "employer" is as "any person acting directly or indirectly in the interest of an employer in relation to an employee," id. at § 203(d) (emphasis). To "employ" means "to suffer or permit to work." Id. at § 203(g). "[T]he striking breadth of these definitions brings within the FLSA's ambit workers who might not qualify as employees under a strict application of traditional agency law principles or under other federal statutes." Salinas v. Commercial Interiors, Inc., 848 F.3d 125, 133 (4th Cir. 2017) (quotations omitted).

"The scope of these definitions, however, is not limitless." Benshoff, 180 F.3d at 140. "Because the Act does not define which activities constitute 'employment' sufficient to trigger its provisions, 'employment' is to be determined by its commonly understood meaning, which is 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.'" Id. (quoting Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944)). In making this inquiry, the court must "remain mindful that the employer-employee relationship does not lend itself to rigid per se definitions, but depends upon the circumstances of the whole activity." Id. at 141 (quotations omitted).

Although the Fourth Circuit has not expressly listed all factors that might bear on whether an individual defendant is an "employer" under the FLSA, district courts within the circuit,

including this one in the instant case, previously have enumerated certain additional factors based upon a survey of federal case law. These include whether the individual defendant "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Garcia v. Frog Island Seafood, Inc., 644 F. Supp. 2d 696, 721 (E.D.N.C. 2009). Further factors may include whether the individual has "extensive managerial responsibilities," or "the person's job description," or "his or her financial interest in the enterprise." Lima v. Stanley, No. 5:14-CV-896-FL, 2015 WL 4769546, at *6 (E.D.N.C. Aug. 12, 2015) (quotations omitted); see Kelly v. Hosp. Ventures LLC, No. 5:17-CV-98-FL, 2017 WL 3880318, at *5 (E.D.N.C. Sept. 5, 2017) (same). Behind each such factor, the key is whether "the individual [defendant] has sufficient operational control over the workers in question and the allegedly violative actions to be held liable for unpaid wages or other damages." Garcia, 644 F. Supp. 2d at 720 (quotations omitted).[9]

In this case, plaintiff has brought forth sufficient evidence, drawing reasonable inferences in the light most favorable to her, to create a jury issue as to Wendy Howington's status as an employer under the FLSA and NCWHA. She had a financial interest in MH & WH. (Pl's Stmt. (DE 145) ¶ 3). Her work for MH & WH included payroll duties; handling insurance and workers compensation; maintaining personnel files for employees of MH & WH; and filling out forms when former employees filed for unemployment. (W. Howington Dep. pp. 11-12, 14-15, 20). MH & WH did not have any other designated employees who performed human resources functions. (Id. at 15).

---

[9] Because the definition of employer in the NCWHA is identical to that used in the FLSA, see N.C. Gen.Stat. § 95-25.2(5), the court's analysis of whether defendant is an employer under for purposes of plaintiff's NCWHA claim is the same, for purposes of the instant motion, as that expressed in the text above under the FLSA. See Garcia, 644 F. Supp. 2d at 720 n.28.

Defendant Wendy Howington also hired employees to work at a gas station owned by MH & WH, and she supervised those employees. (Id. at 17). Defendant Michael Howington hired non-gas station employees of MH & WH, and he had authority to discipline and fire them. (Id. at 17-18). In either case, defendant Michael Howington, in conjunction with defendant Wendy Howington made a determination whether to classify an employee as exempt or nonexempt for purposes of qualification for overtime pay. (Id. at 118).

In addition, according to plaintiff, Wendy Howington managed determination of plaintiff's pay and credit for hours worked. For example, "Wendy Howington . . . said that she wasn't going to pay me for my time because the sheets had disappeared, so there was no way to prove the time I had worked." (Pl's Dep. p. 173). According to plaintiff:

> I always noted where I was, what I was doing, how long I had been there. Because Wendy Howington had told me, "No sheets, no pay." . . . And [Wendy Howington] would always say to me, "Sorry. If there's no way to account for the time, if there's nothing justifying the time on the sheet, we can't pay you for it."

(Id. at 174). In addition:

> It was never the right amount. I told her it wasn't the right amount. That's why the secretary here even made note of it. And . . . I said, "No, this is not the right amount. I'm owed more. This is a mockery." The secretary said, "Let me check with Wendy and see what she says." And she just said, "I'm sorry. That's all we're going to give you."

(Id. at 177) (emphasis added). Furthermore:

> I talked to Wendy Howington about it, and she said, "Well, you're not working." I said, "I am working." She said, "No. You go to the gas station, so those hours get shorted because that's not work." I said, "I am working. I'm told to do that. I'm told to go to the gas station to do maintenance work there."

(Id. at 178). At one point, plaintiff asked Hernandez about her time sheets and hours, and she asked him "What's happening with the overtime that I'm owed? . . . Can you help me resolve my

21

problem?" (Id. at 190). He responded: "I'll take care of stuff that I am noting presently. <u>All that,</u> <u>you take of that with Wendy [Howington]</u>." (Id.) (emphasis added). At another point, she went to Michael Howington and said, "Look, why is it that you're asking me to work overtime, I work it, and I'm not getting paid?" He said, "<u>Look you fix that with Wendy [Howington]</u>." (Id. at 192) (emphasis added). When plaintiff then talked to Wendy Howington, she said "<u>I don't pay extra</u> <u>hours</u>," and, according to plaintiff, she kept saying "<u>I'll fix it next week</u>." (Id. at 192-93) (emphasis added). Wendy Howington also stated that plaintiff's hourly records were "lost." (Id. at 194). According to plaintiff, "Wendy would grab whatever available pretext to discount time and money from my checks." (Id. at 204).

In sum, drawing inferences in the light most favorable to plaintiff, defendant Wendy Howington was intimately involved in determining the extent of plaintiff's compensable time, setting policies and procedures for time recording, and acting as the final arbiter of time and pay grievances. She maintained employment records, and she also told plaintiff that her hourly records were lost. She thus had considerable control over whether and how much plaintiff would be paid for her work for defendant WH & MH and at HBG construction sites. Accordingly, based on the totality of the circumstances, plaintiff has presented sufficient evidence to create a triable issues as to whether defendant Wendy Howington was an employer within the meaning of the FLSA and NCWHA.

Defendant Wendy Howington argues, nonetheless, that she was not an employer based upon several factors. For example, she notes she was employed in a "clerical capacity" on a part time basis, and did not have any input over employee work schedules or conditions of employment. (W. Howington Mem. (DE 138) at 6, 8). But, in so characterizing her work, she draws inferences in a

22

light favorable to her, and not to plaintiff, based upon plaintiff's testimony as set forth above. She also notes she had no authority to hire or fire plaintiff. But, that factor alone is not determinative to the analysis of whether she was acting in the capacity of plaintiff's employer. Crediting plaintiff's testimony, there is sufficient evidence of Wendy Howington's control over time records, determining plaintiff's pay, and addressing issues with pay and time records, coupled with ownership interest in WH & MH, to create a genuine issue of fact over her status as an employer.

Therefore, defendant Wendy Howington's motion for summary judgment is denied.

4.     FLSA Claim Against Defendant MH & WH

Defendant MH & WH argues that is not subject to the FLSA because it did not have a sufficient annual gross volume of business done during the relevant time period to qualify as a covered entity under the statute. As set forth below, however, plaintiff has presented sufficient evidence for trial that defendants HBG and MH & WH operated as a single enterprise for purposes of her FLSA claim.

The FLSA imposes minimum wage and maximum requirements for employees employed "in an enterprise engaged in commerce or in the production of goods for commerce," 29 U.S.C. §§ 206, 207. This statutory phrase is defined to include "an enterprise whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1).

> "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor.

29 U.S.C. § 203(r)(1). Here, where it is undiputed that defendant MH & WH's sales for 2012 and 2013 were $261,383 and $247,817, respectively (Def. MH & WH Mem. Ex. 1 (DE 141-1) at 4),

defendant MH & WH cannot be liable under the FLSA unless it was operating in conjunction with defendant HBG as a single enterprise, as plaintiff contends.

"The Act . . . requires a three-part showing to bring an entity or entities within the definition of enterprise: 1) the entity or entities must engage in 'related activities,' 2) performed through 'unified operation' or 'common control,' 3) for a common business purpose." Dole v. Odd Fellows Home Endowment Bd., 912 F.2d 689, 692 (4th Cir. 1990). "When different business entities are involved, the critical inquiry is whether there is operational interdependence in fact." Id. (quotations omitted). "Entities which provide mutually supportive services to the substantial advantage of each entity are operationally interdependent and may be treated as a single enterprise under the Act." Id. at 692-693.

"[A] common business purpose includes activities which are directed to the same business objective or to similar objectives in which the group has an interest." Brock v. Hamad, 867 F.2d 804, 807 (4th Cir. 1989). For example, in Hamad, the Fourth Circuit recognized that when "services provided are substantially similar from project to project, and have the common purpose of maintaining and operating apartment buildings, then the common business purpose test is satisfied." Id.; see also Brock v. Guffey, Hubbell, McGhee, P.C., No. 86-2523, 1987 WL 38297 *2 (4th Cir. July 30, 1987) (holding that although engineering and surveying companies provide different services, regulated and licensed by different bodies, "they are both part of the construction industry," had interdependent activities, had "common ownership and control" and share a common business purpose in construction projects).

In this case, plaintiff has demonstrated a genuine issue of material fact as to whether defendants MH & WH and HBG constitute a "single enterprise" under the FLSA. Defendant MH

& WH supplied labor to HBG for construction projects. (Pl's Stmt. (DE 145) ¶ 5). They maintained

the same business address. (Def. HBG Stmt. (DE 150) ¶¶ 2, 4). Defendant Michael Howington was

responsible for management of HBG's construction, and he had an ownership interest in HBG. (Id.

¶¶ 8, 9). He formed HBG in 2006 with non-party Warren Halle. (MH & WH Dep. (30(b)(6) by M.

Howington) pp. 27-28). His management responsibilities for HBG included design, site work, and

"construction management," including visiting construction sites to check on the quality of work

performed by subcontractors. (Id. pp. 37-39; Pl's Stmt. (DE 145) ¶¶ 10, 11). HBG held out to the

public that defendant Michael Howington was acting in the capacity of a vice president for HBG.

(Id. at 62-63). An employee of MH & WH who worked on HBG job sites, Moises Hernandez

("Hernandez"), acted as a manager to laborers on HBG job sites. (Id. p. 69). This evidence

demonstrates operational interdependence in fact, substantially similar purposes in construction

industry, commonality of ownership and control, thus creating a genuine issue of material fact that

MH & WH and HBG constitute a single "enterprise" for purposes of the FLSA.

Where defendant MH & WH offers no argument bearing on the single "enterprise" factors,

summary judgment accordingly must be denied as to this claim against defendant MH & WH.

     5.     NCWHA Claims

          a.     Joint Employer Liability

Defendants HBG and MH & WH argue that they cannot both be liable as joint employers

under the NCWHA because joint employer liability applies only under the FLSA and not the

NCWHA.

"A single individual may stand in the relation of an employee to two or more employers at

the same time" under the FLSA, in light of the "expansive" statutory definitions of "employer" and

"employee." Salinas, 848 F.3d at 133. "[T]he joint employment doctrine: (1) treats a worker's employment by joint employers as 'one employment' for purposes of determining compliance with the FLSA's wage and hour requirements and (2) holds joint employers jointly and severally liable for any violations of the FLSA." Id. at 134 (quoting Schultz v. Capital Int'l Sec., Inc., 466 F.3d 298, 305, 307, 310 (4th Cir. 2006)).

Neither the Fourth Circuit nor the North Carolina Supreme Court has examined whether the joint employment doctrine applies for purposes of liability under the NCWHA. Nevertheless, the Fourth Circuit in Salinas held that resolution of the "FLSA joint employment question also resolves [a] [p]laintiffs' claims under the Maryland Wage and Hour Law, which defines 'employer' consistently with the FLSA." Id. at 131 n. 3. This reasoning applies with greater force here because the NCWHA is not only "consistent[]" with the FLSA, id., but in fact it uses identical definitions of "employer" and "employee" as the FLSA. See N.C. Gen. Stat. § 95-25.2; 29 U.S.C. § 203.

Defendants HBG and MH & WH argue that they are not aware of any case interpreting the NCWHA to incorporate the joint employment doctrine, and that federal courts "should not create or expand the State's public policy." (HBG Mem. (DE 130) at 6 (quoting St. Paul Fire & Marine Ins. Co. v. Jacobson, 48 F.3d 778, 783 (4th Cir. 1995)). However, defendants have not suggested how identical terms in the NCWHA, statutorily defined identically to the same terms in the FLSA, could be interpreted in a manner materially different from the FLSA. In light of the Fourth Circuit's holding in Salinas, there is no plausible basis so to do.

Moreover, although the North Carolina Supreme Court has not addressed the issue, the North Carolina Court of Appeals has recognized that the NCWHA is "modeled after" the FLSA, and it has recognized the alignment of the policy of the NCWHA and FLSA in looking to federal case law in

26

interpreting the identically defined terms in the NCWHA. Laborers' Int'l Union of N. Am., AFL-CIO v. Case Farms, Inc., 127 N.C. App. 312, 314 (1997); see, e.g., Leverette v. Labor Works Int'l, LLC, 180 N.C. App. 102, 114 (2006) (looking to federal FLSA case law in interpreting meaning of "enterprise" within the meaning of the NCWHA).

Therefore, defendant HBG and MH & WH's motions in this part must be denied.

b.    NCWHA Exemption for Overtime Claims

Defendant HBG and MH & WH argue, as limited by their reply brief, that plaintiff's NCWHA claim must be dismissed to the extent that the NCWHA claim seeks overtime wages.

Plaintiff's claim under the NCWHA is based upon defendants' failure to pay plaintiff "all owed, earned, and promised wages," in violation of N.C. Gen. Stat. § 95-25.6, also known as a "payday" claim. (Am. Compl. ¶ 77).

The NCWHA sets forth a "payday" claim as follows:

> Every employer shall pay every employee all wages and tips accruing to the employee on the regular payday. Pay periods may be daily, weekly, bi-weekly, semi-monthly, or monthly. Wages based upon bonuses, commissions, or other forms of calculation may be paid as infrequently as annually if prescribed in advance.

N.C. Gen. Stat. § 95-25.6. It also sets forth separately an "overtime" pay claim as follows:

> Every employer shall pay each employee who works longer than 40 hours in any workweek at a rate of not less than time and one half of the regular rate of pay of the employee for those hours in excess of 40 per week.

N.C. Gen. Stat. § 95-25.4.  Finally, it sets forth "exemptions" to such a claim in the context of a plaintiff subject to the FLSA, in pertinent part:

> The provisions of [§] 95-25.4 (Overtime) . . . do not apply to: (1) Any person employed in an enterprise engaged in commerce or in the production of goods for commerce as defined in the [FLSA] . . . .

N.C. Gen. Stat. § 95-25.14(a).

Because plaintiff's "payday" claim covers all unpaid "wages and tips," whereas the overtime exemption provision only bars claims based upon overtime pay as pertinent here, plaintiff's NCHWA claim may proceed to the extent it seeks unpaid, earned, compensation apart from overtime pay. Here, plaintiff has brought forth evidence of failure to pay both overtime hours as well as other hours more generally, not dependent upon categorization as overtime, as detailed herein. (See, e.g., Pl's Dep. pp. 173-204). By contrast, that portion of plaintiff's NCWHA claim premised upon overtime pay must be dismissed as exempted based upon the plain language of § 95-25.14(a).

Plaintiff suggests nonetheless that she should be permitted to assert a claim to recover unpaid overtime wages under § 95-25.6, because her "payday" claim is not specifically preempted by § 95-25.14(a). However, allowing plaintiff to recover overtime wages under the NCWHA, through the avenue of a "payday" claim under § 95-25.6, would render meaningless the exemption for overtime claims in § 95-25.14(a).

Neither the Fourth Circuit Court of Appeals nor the North Carolina Supreme Court has addressed the scope of this overtime exemption provision in a case asserting overtime violations under the FLSA. Earlier in the instant case, this court addressed exemption as follows, in magistrate judge memorandum and recommendation on frivolity review entered July 7, 2015:

> The court recognizes that certain claims otherwise assertable under the NCWHA are preempted by the FLSA, including minimum wage, overtime, and record-keeping claims. LunaReyes v. RFI Constr., LLC, [109 F.Supp.3d 744, 752-53] (M.D.N.C. 2015). Because payday claims, see N.C. Gen.Stat. § 95-25.6, are not so preempted, the court need not address the propriety of allowing plaintiff to assert NCWHA claims in the alternative at this time.

Lima v. Stanley, No. 5:14-CV-896-FL, 2015 WL 4769546, at *7 (E.D.N.C. Aug. 12, 2015) (adopting memorandum and recommendation). The court's prior ruling in the instant case is not conclusive. Now, upon summary judgment motions, the court has had occasion to determine based

28

upon the evidence proffered the extent to which plaintiff may continue with a "payday claim" for earnings apart from overtime wages.

The court's present determination is consistent with other federal district court decisions addressing the exemption covering NCWHA overtime claims. For example, in <u>DeHoll v. Eckerd Corp.</u>, No. 1:18CV280, 2018 WL 5624150, at *5 (M.D.N.C. Oct. 30, 2018), the court recognized that it is "well established that in order to bring a claim under the NCWHA payday provision, the claim must be separate and distinct from the plaintiff's FLSA minimum wage and overtime claims." The court dismissed a claim where the plaintiff's "allegations [were] the very same ones upon which [plaintiff] relies to support his minimum wage and overtime claims." <u>Id.</u> Based on a survey of case law, the court also reasoned that "allowing Plaintiffs to recover unpaid overtime under the payday statute would be wholly incompatible with the exemption provision." <u>Id.</u> (citation omitted).

Many cases cited by plaintiff are distinguishable due to their procedural posture and circumstances, or they support the partial dismissal determination as is reached in the instant case. <u>See, e.g.</u>, <u>Luna-Reyes v. RFI Const., LLC</u>, 109 F. Supp. 3d 744, 752 (M.D.N.C. 2015) (denying motion to dismiss in its entirety a claim under § 95-25.6); <u>Aguilar-Gamas v. Scott Farms, Inc.</u>, No. 5:13-CV-447-FL, 2014 WL 12769404, at *3 (E.D.N.C. Jan. 6, 2014) (granting motion to strike defense premised upon complete preemption asserted in answer); <u>Hanson-Kelly v. Weight Watchers Int'l, Inc.</u>, No. 1:10CV65, 2011 WL 2689352, at *5 (M.D.N.C. July 11, 2011) (declining to dismiss NCWHA claim where plaintiffs were "not seeking overtime pay or asserting that they received less than the federal minimum wage . . . [but] rather, they are seeking unpaid wages for time they actually worked"); <u>Gaxiola v. Williams Seafood of Arapahoe, Inc.</u>, 776 F. Supp. 2d 117, 132 (E.D.N.C. 2011) (allowing NCWHA claim to continue based upon failure to pay promised wage,

without discussing overtime wages); Romero v. Mountaire Farms, Inc., 796 F. Supp. 2d 700, 710 (E.D.N.C. 2011) (analyzing preemption by FLSA, but not discussing § 95-25.14(a) exemption for overtime claims); McLaurin v. Prestage Foods, Inc., 271 F.R.D. 465, 471 (E.D.N.C. 2010) (analyzing supplemental jurisdiction and class action certification, but not discussing § 95-25.14(a) exemption for overtime claims). To the extent cases cited by plaintiff suggest more generally that both an FLSA claim and a payday claim under § 95-25.6 for overtime wages can proceed in tandem, the court rejects this approach as contrary to the plain language of the statute and the weight of authority set forth above.

In sum, defendant HBG and MH & WH's motions for summary judgment as to plaintiff's NCWHA claim are granted in part and denied in part. That portion of plaintiff's NCWHA claim premised upon overtime pay must be dismissed as exempted under § 95-25.14(a), whereas the remaining portion premised upon unpaid regular time will be allowed to proceed.

6.      Tort Claims

Defendants HBG and MH & WH argue that they cannot be held liable for Stanley's alleged torts of assault, battery, and IIED, because his purported misconduct was outside the scope of his employment as a superintendent for defendant HBG. Viewing the evidence in the light most favorable to plaintiff, however, there is ample evidence that Stanley was acting within the scope of his employment at all times pertinent to plaintiff's tort claims.

An employer will be liable under a theory of respondeat superior "when the employee's act is [1] expressly authorized; [2] committed within the scope of the employee's employment and in furtherance of his master's business—when the act comes within his implied authority; or [3] when ratified by the principal." Medlin v. Bass, 327 N.C. 587, 592-93 (1990) (quotations omitted). "To

30

be within the scope of employment, an employee, at the time of the incident, must be acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment." Id. at 593. "Where the employee's actions conceivably are within the scope of employment and in furtherance of the employer's business, the question is one for the jury." Id.

"The rights and liabilities which exist between a principal and a third party dealing with that principal's agent may be governed by the apparent scope of the agent's authority, which is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses." Zimmerman v. Hogg & Allen, Prof'l Ass'n, 286 N.C. 24, 30-31 (1974). "[T]he determination of a principal's liability in any particular case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had, under the circumstances, conferred upon his agent." Id. at 31.

The Fourth Circuit has summarized cogently the considerations under North Carolina law bearing on whether an intentional tort committed by an employee is imputable to an employer:

> North Carolina case law discloses numerous instances in which the issue of whether an intentional assault by an employee was within the scope of employment so as to impose vicarious liability on the employer was determined to be a jury question. See, e.g., Clemmons v. Life Ins. Co. of Ga., 274 N.C. 416, 163 S.E.2d 761, 766 (1968) (collection agent for insurance company threatened plaintiff with pistol when she was unable to pay premium); Munick v. Durham, 181 N.C. 188, 106 S.E. 665, 667 (1921) (city employee assaulted plaintiff when he paid portion of his water bill in pennies); Carawan v. Tate, 53 N.C.App. 161, 280 S.E.2d 528, 531 (1981), modified, 304 N.C. 696, 286 S.E.2d 99 (1982) (parking lot attendant drew gun on plaintiff after plaintiff refused to pay parking fee); Edwards v. Akion, 52 N.C.App. 688, 279 S.E.2d 894, 900 (1981) (sanitation worker grabbed and hit plaintiff after dispute about the manner in which the worker collected plaintiff's refuse). The principle that should govern this factual inquiry has been formulated in various ways by the North Carolina courts: whether the employee was "about his master's business or whether he stepped aside from his employment to commit a wrong prompted by a spirit of vindictiveness or to gratify his personal animosity or to carry out an independent purpose of his own," see Medlin, 398 S.E.2d at 463 (quotation marks and citation omitted); whether the employee acted "as a means or for the purpose of performing

31

the work he was employed to do" or whether he "was advancing a completely personal objective," id. at 464; or whether an employee's act "was a means or method of doing that which he was employed to do" or whether he "departed, however briefly, from his duties in order to accomplish a purpose of his own, which purpose was not incidental to the work he was employed to do," Wegner v. Delly–Land Delicatessen, Inc., 270 N.C. 62, 153 S.E.2d 804, 808 (1967). We do not intend by this discussion to suggest any particular result from the application of this principle to the facts of this case. We merely observe that the inquiry is fact-bound and may involve consideration of such factors as the degree to which the physical confrontation in this case, if one occurred, represented an escalation of a work-related dispute and the degree to which it was motivated by personal animosity.

Borneman v. United States, 213 F.3d 819, 828-29 (4th Cir. 2000).

Here, plaintiff has brought forth sufficient evidence to create a genuine issue of material fact that Stanley was acting in furtherance of defendants' business and for the purpose of accomplishing the duties of his employment when he committed alleged torts against plaintiff. Indeed, every alleged interaction plaintiff describes with Stanley occurred at an HBG job site where Stanley was directing, supervising, and correcting, work by plaintiff and other laborers on the job site. (Pl's Dep. pp. 44-48, 62, 65-66, 68, 72-74, 78, 80, 86-93). Plaintiff describes Stanley directing her to start work, carry out tasks in particular ways, fix issues, and continue working to prepare for inspections. (Id.). The last interaction between plaintiff and Stanley, where Stanley allegedly assaulted and battered plaintiff, took place directly in the course of Stanley directing plaintiff to climb a ladder to fix a sealing issue. (Id. at 86-93).

Defendants HBG and MH & WH argue that Stanley was not acting in the course of their business because he was not actually authorized to supervise plaintiff and he was mistaken in believing that plaintiff was a HBG employee. They rely upon, for example, a declaration by Rifkin, wherein he states "Stanley should not have supervised or directed Plaintiff's work," and he "should

have instructed a subcontractor's supervisor if [he] identified an issue with the quality of work performed by a subcontractor's laborers."  (Rifkin 2nd Decl. (DE 151-8) ¶ 5).

Rifkin, however, commenced his position with defendant HBG in 2014. (id. ¶ 2).  In light of other evidence in the record bearing upon Stanley's authority in 2012, Rifkin's declaration is not determinative as a matter of law on whether Stanley was acting within the scope of his employment and implied authority in 2012.  Equally probative, for example, is the testimony of defendant Howington, who in 2012 was acting in the position of vice president of defendant HBG, responsible for management of HBG's construction, including visiting construction sites to check on the quality of work performed by subcontractors.  ((Pl's Stmt. ¶¶ 8, 9); MH & WH Dep. (30(b)(6) by M. Howington pp. 37-39, 62-63; Pl's Stmt. (DE 145) ¶¶ 10, 11).  According to him, if there was "something that wasn't going on correctly" at a job site, Stanley would tell the "respective supervisors" on the job site what they needed to do to change it or fix it.  (MH & WH Dep. p. 39). According to Michael Howington, Stanley supervised laborers on HBG job sites and "told the laborers what to do."  (M. Howington Dep. p. 72).

Rifkin's statement also conflicts with Stanley's own testimony and plaintiff's testimony about what he actually did and was expected to do at that time. Stanley testified that he supervised about twelve people, including plaintiff, in his position of "supervisor" for defendant HBG in 2012. (Stanley Dep. (DE 136-7) at 14, 18, 27). According to Stanley, he checked on her work told her and another laborer to "please get to work and finish up the job."  (Id. at 28).  Plaintiff testified she started working at an Apex job site and others, under the direction and supervision of different individuals working for defendant HBG, including Stanley. (Pl's Dep. at 40, 44-48; MH & WH Dep. (30(b)(6) by M. Howington) pp. 69, 75, 77, 83, 85).  At one point, Stanley was signing her time

33

have instructed a subcontractor's supervisor if [he] identified an issue with the quality of work performed by a subcontractor's laborers."  (Rifkin 2nd Decl. (DE 151-8) ¶ 5).

Rifkin, however, commenced his position with defendant HBG in 2014. (id. ¶ 2).  In light of other evidence in the record bearing upon Stanley's authority in 2012, Rifkin's declaration is not determinative as a matter of law on whether Stanley was acting within the scope of his employment and implied authority in 2012.  Equally probative, for example, is the testimony of defendant Howington, who in 2012 was acting in the position of vice president of defendant HBG, responsible for management of HBG's construction, including visiting construction sites to check on the quality of work performed by subcontractors.  ((Pl's Stmt. ¶¶ 8, 9); MH & WH Dep. (30(b)(6) by M. Howington pp. 37-39, 62-63; Pl's Stmt. (DE 145) ¶¶ 10, 11).  According to him, if there was "something that wasn't going on correctly" at a job site, Stanley would tell the "respective supervisors" on the job site what they needed to do to change it or fix it.  (MH & WH Dep. p. 39). According to Michael Howington, Stanley supervised laborers on HBG job sites and "told the laborers what to do."  (M. Howington Dep. p. 72).

Rifkin's statement also conflicts with Stanley's own testimony and plaintiff's testimony about what he actually did and was expected to do at that time. Stanley testified that he supervised about twelve people, including plaintiff, in his position of "supervisor" for defendant HBG in 2012. (Stanley Dep. (DE 136-7) at 14, 18, 27). According to Stanley, he checked on her work told her and another laborer to "please get to work and finish up the job."  (Id. at 28).  Plaintiff testified she started working at an Apex job site and others, under the direction and supervision of different individuals working for defendant HBG, including Stanley. (Pl's Dep. at 40, 44-48; MH & WH Dep. (30(b)(6) by M. Howington) pp. 69, 75, 77, 83, 85).  At one point, Stanley was signing her time

33

sheets. (Pl's Dep. at 88). This evidence, viewed in light most favorable to plaintiff, permits an inference that defendants had conferred upon Stanley actual and apparent authority to supervise plaintiff. See Zimmerman, 286 N.C. at 31.

Defendants cite to Wachovia Bank of N. Carolina, N.A. v. Bob Dunn Jaguar, Inc., 117 N.C. App. 165, 172 (1994), for the proposition that "[w]hether the agent acts within the apparent scope of his authority is determined by what the principal does, not by the unauthorized acts and contentions of the agent." This proposition, however, begs the questions that are subject to conflicting evidence in the record, namely what did defendants do in 2012 to represent the authority of Stanley, and was Stanley authorized to do in 2012? While Rifkin provides one view of what Stanley was authorized to do in 2012, Howington, Stanley, and plaintiff provide another. For the same reason, there is a genuine issue of material fact as to what defendants did at the time to represent the actual or apparent authority of Stanley to supervise plaintiff. See Zimmerman, 286 N.C. at 31 (stating that in determining scope of authority, it is necessary to determine "what authority the third person in the exercise of reasonable care was justified in believing that the principal had, under the circumstances, conferred upon his agent").

In sum, summary judgment is precluded on the issue of whether Stanley acted within the scope of his employment in carrying out the torts alleged by plaintiff. Therefore defendants HBG and MH & WH's motions for summary judgment on this issue must be denied.

7.    Medical Damages

Defendants HBG and MH & WH argue that plaintiff cannot establish "medical damages" and other damages dependent thereon, including "lost wages" and "pain and suffering," for her Title VII claims and state law claims. The court addresses each category of claims in turn.

34

a. Title VII

Under Title VII, compensatory damages are available for, among other things, "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3); see Homesley v. Freightliner Corp., 61 F. App'x 105, 116 (4th Cir. 2003); Fox v. Gen. Motors Corp., 247 F.3d 169, 180 (4th Cir. 2001). "Courts defer to a jury's award of damages for intangible harms, such as emotional distress, because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." Fox, 247 F.3d at 180. "[A] plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress." Bryant v. Aiken Reg'l Med. Centers Inc., 333 F.3d 536, 546 (4th Cir. 2003).

In addition, a successful plaintiff in a Title VII case may be "awarded backpay as a matter of course." Albemarle Paper Co. v. Moody, 422 U.S. 405, 420 (1975). Title VII permits "restoration of persons aggrieved to the situation they would have occupied were it not for the unlawful discrimination." Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1273 (4th Cir. 1985).

By contrast, "expert opinion is of course the prime – indeed usually the only – way to prove medical causation." Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 164 n. 2 (4th Cir. 1988). "[I]n order to qualify on causation, the opinion testimony of the medical expert may not be stated in general terms but must be stated in terms of a reasonable degree of medical certainty." Fitzgerald v. Manning, 679 F.2d 341, 350 (4th Cir. 1982) (quotations omitted).

Here, plaintiff testifies at length about the emotional distress she suffered as a result of the alleged unlawful employment practices of defendants HBG and MH & WH. (See, e.g., Pl's Dep. 9, 12-13, 57-59, 70, 74-75, 81, 83-84, 86, 92-93, 94-95, 101, 156-157, 160, 161-162, 162-163). Based upon such evidence, plaintiff is entitled to seek damages for emotional distress. Indeed,

35

defendants do not contend otherwise, and they do not dispute that plaintiff is "able to seek damages for emotional distress." (Reply (DE 153) at 4). In plaintiff's complaint, however, she additionally seeks Title VII damages for "loss of physical control" (Am. Compl. ¶ 89). Where plaintiff claims that defendants' alleged Title VII violations caused a medical condition, plaintiff has not offered sufficient evidence of causation to support such a claim. Accordingly, in this part, defendants HBG and MH & WH's motions for summary judgment are granted.

Defendants HBG and MH & WH suggest that plaintiff cannot recover damages for "lost wages" and "pain and suffering" for Title VII violations. Plaintiff, however, does not suggest a basis for an award of "lost wages" apart from back pay properly allowed as part of damages for a Title VII violation. (See Pl's Mem. (DE 148) at 10-11; Am. Compl. ¶ 89). She also does not suggest damages for "pain and suffering" separate from "emotional pain, [and] suffering," also properly allowed as part of damages for a Title VII violation. See id. 42 U.S.C. § 1981a(b)(3). Accordingly, defendants HBG and MH & WH's motions for summary judgment in this part are denied.

b.    State Tort Claims

Damages allowed for plaintiff's state tort claims fall along a similar lines as her Title VII claim.

Under North Carolina law, "in [tort] actions, the plaintiff is entitled to recover, in addition to nominal damages, compensation for the actual damages done him, and . . . mental anguish is actual damage." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 292 (1990) (quotations omitted). "North Carolina law allows recovery for negligent infliction of purely emotional or mental injury—without physical impact, physical injury, or physical manifestations." Id. at 296; see Pacheco v. Rogers & Breece, Inc., 157 N.C. App. 445, 450 (2003) ("Proof of severe

36

emotional distress does not necessarily require medical evidence or testimony.") (quotations omitted). By contrast, "[i]n cases involving complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Holley v. ACTS, Inc., 357 N.C. 228, 232 (2003)

In plaintiff's complaint, plaintiff asserts damages for "PTSD" "paralysis" "pain" and "significant medical expenses." (Am. Compl. ¶¶ 96, 106, 113). In her brief in opposition to summary judgment, however, plaintiff only asserts she is entitled to damages for "severe emotional distress." (Pl's Mem. (DE 148) at 18). She does not bring forth any evidence of medical causation sufficient to establish damages for specific medical conditions such as PTSD, paralysis, or continuing physical pain, nor significant medical expenses, as asserted in the complaint. (See id.). Accordingly, plaintiff's damages claims for "PTSD" "paralysis" "pain" – if referring to continuing physical pain – and "significant medical expenses," (Am. Compl. ¶¶ 96, 106, 113), must be dismissed as a matter of law. In this part, defendants HBG and MH & WH's motions for summary judgment are granted.

8.      Joint Employment

Plaintiff moves for partial summary judgment on the determination that defendants HBG and MH & WH "jointly employed" plaintiff for purposes of the FLSA, Title VII, NCWHA, and North Carolina common law.

As noted above, "[a] single individual may stand in the relation of an employee to two or more employers at the same time" under the FLSA, in light of the "expansive" statutory definitions of "employer" and "employee." Salinas, 848 F.3d at 133. Joint employment under the FLSA turns on "one fundamental question: whether two or more persons or entities are not completely disassociated with respect to a worker such that the persons or entities share, agree to allocate

37

responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." Id. at 141 (emphasis added). In answering this question courts should consider six factors:

> (1) Whether, formally or <u>as a matter of practice,</u> the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;

> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;

> (3) The degree of permanency and duration of the relationship between the putative joint employers;

> (4) Whether, through <u>shared management</u> or a direct <u>or indirect</u> ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

> (5) Whether the work is performed on a premises owned or <u>controlled by</u> one or more of the putative joint employers, independently or in connection with one another; and

> (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or <u>providing the facilities, equipment, tools, or materials necessary to complete the work</u>.

Id. at 141-42 (emphasis added). "[O]ne factor alone can serve as the basis for finding that two or more persons or entities are 'not completely disassociated' with respect to a worker's employment if the facts supporting that factor demonstrate that the person or entity has a substantial role in determining the essential terms and conditions of a worker's employment." Id. at 142.

The Fourth Circuit has set forth the following nine factors to use in assessing whether an individual is jointly employed by two or more entities for purposes of Title VII:

> (1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 414 (4th Cir. 2015). "None of these factors are dispositive." Id. However, "the common-law element of control remains the principal guidepost in the analysis," and the first three factors "are the most important." Id. In comparing the Title VII test to the FLSA test, the Fourth Circuit has noted that "FLSA's definition stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles" Id. at 412 n. 10 (quotations omitted).

Under North Carolina common law, "an employer-employee relationship exists where the party for whom the work is being done retains the right to control and direct the manner in which the details of the work are to be executed." McCown v. Hines, 353 N.C. 683, 688 (2001).

With respect to the FLSA, defendants' own statements of facts and undisputed facts of the record support multiple factors demonstrating FLSA joint employer liability. First,"as a matter of practice," Stanley directed and supervised plaintiff as superintendent for defendant HBG. Salinas,

848 F.3d at 133. Stanley "directed about twelve MH & WH laborers," and he "instructed MH & WH laborers." (HBG Stmt. (DE 131) ¶¶ 17-18). When plaintiff first started, Stanley "told her what job she was going to be doing," and some time later he "assigned her to do" sheetrock work. (Stanley Dep. at 27). On her last day, according to Stanley, he asked plaintiff and another laborer "if they would please get to work and finish up the job; if not we were going to have to stay there late." (Id. at 28). Defendants point to the Rifkin declaration for the proposition that Stanley "should not have supervised or directed Plaintiff's work." (Rifkin Decl. p 5). This proposition, however, is not determinative to satisfaction of the first FLSA factor, where, as here, it turns on whether Stanley, as an HBG superintendent, supervised plaintiff "as a matter of practice." Salinas, 848 F.3d at 133.

Second, although defendant HBG did not hire or fire plaintiff according to its account of the facts, the supervisors for HBG, Stanley, Gramling, Torgeson, and Cattano, all "could demand that [MH & WH] prohibit a laborer, who might be causing problems on the jobsite, from ever returning to the project." (HBG Opp. Stmt. (DE 150) ¶ 32) (emphasis added). This undisputed fact satisfies the second FLSA factor that "as a matter of practice, the putative joint employers jointly . . . allocate the power to – directly or indirectly – modify the terms or conditions of the worker's employment." Salinas, 848 F.3d at 133 (emphasis added).

Third, there is a significant "degree of permanency" and "common control" between the putative joint employers, id. as demonstrated through defendants' own statement of facts. They operated out of the same office. (HBG Opp. Stmt. (DE 150) ¶¶ 2, 4). Defendant "MH & WH supplied labor to [defendant HBG] for construction projects." (Id. ¶ 3). Michael Howington, owner and member of MH & WH, "was a limited partner in [HBG]," and "owned a financial interest in

40

[HBG]. (Id. ¶ 8; HBG Stmt. (DE 131) ¶ 3; ). Michael Howington "was responsible for management of [HBG's] construction," and he "visit[ed] construction sites to check on the quality of work performed by the subcontractors," one of which was MH & WH. (HBG Stmt. ¶¶ 6, 8, 11). HBG managers and supervisors, such as Gramling, Stanley, Torgeson, and Cattano, were "responsible for supervising . . . MH & WH" on HBG construction sites. (HBG Opp. Stmt. ¶¶ 13-16). Stanley reported to Gramling, who reported to Michael Howington. (Id. ¶ 26).

Fourth, plaintiff's work was performed on a premises "controlled by" defendant HBG, where the defendant HBG supplied "facilities, equipment, tools, or materials necessary to complete the work." Salinas, 848 F.3d at 141-42. In particular plaintiff worked at HBG "construction sites." (HBG Opp. Stmt. ¶ 11). HBG, "as a general contractor, held weekly safety meetings for all subcontractors on the jobsite." (Id. ¶ 28). HBG "makes available for all subcontractors certain equipment and materials, such as skid steer, a forklift, gloves, hardhats, eye protection, nails, and brooms." (Id. ¶ 29). HBG "had the authority to direct a subcontractor that one of its laborers could not work on the jobsite." (Id. ¶ 32). On occasion, "Warren Halle and Martha Halle would distribute holiday gift cards at jobsites." (Id. ¶ 21).

In light of these facts satisfying components of each of the FLSA factors, plaintiff has demonstrated as a matter of law that defendants HBG and MH & WH are "not completely disassociated" with respect to plaintiff such that they "codetermine – formally or informally, directly or indirectly – the essential terms and conditions of [plaintiff's] employment." Salinas, 848 F.3d at 141.

The court recognizes that some components of the FLSA factors are not met by application of the facts viewed in light most favorable to defendants, particularly functions such as "handling

41

payroll; providing workers' compensation insurance; paying payroll taxes." Salinas, 848 F.3d at 141-42. The weight of the factors, however, support a determination as a matter of law of joint employment liability under the FLSA, particularly where several factors as set forth by the court in Salinas contain qualifications, including "as a matter of practice," "direct or indirect," and other alternative means of satisfying each factor, with the ultimate focus on "whether two entities are 'entirely independent' or 'not completely disassociated.'" Id. at 141-42 (emphasis in original). This low bar, as articulated by the Fourth Circuit, is met here.

Accordingly, summary judgment for plaintiff is warranted on the issue of joint employer liability for purposes of the FLSA. That determination also applies to the remaining portion of plaintiff's NCWHA claim, in light of the incorporation of FLSA law therein, as set forth above at section B.5. of this order.

By contrast, joint employer liability under Title VII is not so expansive as it is under the FLSA to permit a determination as a matter of law on this issue. Many of the Title VII factors are stated in less qualified manner than FLSA factors, or are more specific, setting up a genuine issue of fact as to their resolution based on the same record. Where many FLSA factors can be satisfied by alternative means, Title VII factors are not so broadly worded.

For example, the factors "authority to hire and fire the individual" and "formal and informal training," Butler, 793 F.3d at 414, do not resolve as a matter of law in favor of plaintiff where "Stanley never fired or disciplined any laborers, " "Hernandez trained Plaintiff," and "Howington hired plaintiff." (HBG Opp Stmt. ¶¶ 25, 27; HBG Stmt. ¶¶ 13-14). Regarding "possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes," HBG "did not create, maintain or keep any time records for MH & WH laborers." (HBG Opp. Stmt.

¶ 18). Whether plaintiff's "duties are akin to a regular employee's duties" invites comparison between plaintiff and undisputed employees of defendant HBG, such as Stanley, who had much different duties than plaintiff. (Id. ¶ 36). Whether plaintiff "is assigned solely to the putative employer" heightens the importance of the fact that plaintiff reported for work regularly at a gas station owned by MH & WH, which had nothing to do with HBG. (Id. ¶ 22).

While, of course, there is some overlap between portions of FLSA and Title VII factors and facts pertinent thereto (e.g., FLSA: "direct, control, or supervise the worker"; Title VII: "day-to-day supervision of the individual, including employee discipline"), summary judgment is precluded under the stricter Title VII standard emphasizing "common-law element of control" and "application of traditional agency law principles." Butler, 793 F.3d at 412 n. 10 & 414. Therefore, plaintiff's motion for summary judgment is denied in this part.

For the same reason, given the incorporation of common law into Title VII, summary judgment on this issue for plaintiff's common law claims is not warranted. See id.; McCown, 353 N.C. at 688. Moreover, published cases cited by plaintiff pertaining to her tort claims concern the question of whether an employee was an independent contractor for purposes of Title VII and North Carolina law. E.g., Farlow v. Wachovia Bank of N. Carolina, N.A., 259 F.3d 309, 313 (4th Cir. 2001); Youngblood v. N. State Ford Truck Sales, 321 N.C. 380, 387 (1988); McCown, 353 N.C. at 687. These cases do not analyze whether two entity defendants are "joint employers," and they do not provide a basis at this time for grant of summary judgment on an issue of "joint employer" liability for purposes of plaintiff's common law torts.

In sum, plaintiff's motion for summary judgment on the issue of "joint employer" liability is granted in part and denied in part. Plaintiff is entitled to summary judgment on those parts of her

FLSA and NCWHA claims raising the issue of whether defendants HBG and MH & WH were joint employers for purposes of FLSA and NCWHA liability. Plaintiff's motion for summary judgment on the issue of joint employer liability is denied in remaining part.

## CONCLUSION

Based on the foregoing, the court orders as follows:

1) Motions for partial summary judgment by defendants MH & WH and HBG (DE 129, 140) are GRANTED IN PART and DENIED IN PART. Plaintiff's claim under the NCWHA is DISMISSED IN PART as set forth herein, and in remaining part is allowed to proceed. Plaintiff's claims for damages for loss of physical control, PTSD, paralysis, continuing physical pain, and significant medical expenses, for her Title VII and common law claims are DISMISSED IN PART as set forth herein. The instant motions are denied in remaining part.

2) Motions for summary judgment by defendants Michael Howington and Wendy Howington (DE 137, 142) are DENIED.

3) Plaintiff's motion for partial summary judgment on the issue of "joint employer" liability (DE 133) is GRANTED IN PART and DENIED IN PART. Plaintiff is entitled to summary judgment on those parts of her FLSA and NCWHA claims raising the issue of whether defendants HBG and MH & WH were joint employers for purposes of FLSA and NCWHA liability. Plaintiff's motion is denied in remaining part.

4) Where claims remain for trial, in accordance with case management order entered July 14, 2017, as amended, the case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to confer and

file within **21 days** from the date of this order a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates. In addition, the parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute resolution procedures in advance of trial. If the parties seek court-hosted settlement conference, they shall note in their report three alternative dates of availability.

SO ORDERED, this the 8th day of March, 2019.


_____
LOUISE W. FLANAGAN
United States District Judge